UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

KIMETTA SUBLETT,           )
                                )
         Plaintiff          )
                                )
        v.                )      Case No.  3:19-cv-00708-GNS-CL
                                )      ***Electronically Filed***
MASONIC HOMES OF KENTUCKY,   )
INC.                      )
                                )
        Defendant    )

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff Kimetta Sublett, for her Response to Defendant Masonic Homes of Kentucky, Inc.'s Motion for Summary Judgment, DN 50, states:

### INTRODUCTION

Plaintiff Kimetta Sublett worked for Defendant Masonic Homes of Kentucky (MHK) for over thirty years, working her way up through the ranks and devoting her entire work life to the company, until she began to experience the effects of age and a respiratory disability in 2017. Within a year, she disclosed her disability-related needs, requested various accommodations, experienced an abrupt demotion, and was summarily fired for not being "a good fit."  She was replaced, twice, by younger, non-disabled workers.  Right after firing Sublett, MHK "revamped" her job description from that of a largely sedentary desk job to a job where a worker had to spend more than two-thirds of the time standing or walking.  At the close of discovery, MHK cannot point to rules or policies that Sublett is supposed to have broken.  Instead, the employer asserts hyperbolic factual claims that the cited evidence does not support, while ignoring the severe circumstantial evidence that its managers are biased and retaliatory.  The Court should deny the instant Motion and set this matter for trial.

## FACTS

MHK is a large Kentucky employer, overseeing over 600 workers.[1]  According to its public website, MHK advertises services including assisted living, dialysis, home care, palliative care, memory care, life care, rehabilitation, skilled nursing, daycare, preschool, and personal care.[2]  Across those services, and the wide range of acuity and needs, MHK runs several facilities on three major Kentucky campuses.[3]  The central campus, in Louisville, Kentucky, was the situs of MHK's employment of Kimetta Sublett for well over three decades, where she was once highlighted as "one of [MHK]'s longest working employees."[4]

Sublett, who was born in January of 1960, began working at MHK as a clinical care aide in 1986 when she was twenty-six years old.[5]  Over more than three decades, she worked her way up, serving as a nurse, a nursing director, and ultimately, the Director of Pillars Assisted Care Center.[6]  By the 2010s, Sublett had formulated the plan to work for MHK for the rest of her career, until retirement.[7]  Of all of her roles at MHK, the Director role was the most prestigious that Sublett held, as it was a leadership role with supervisory and strategic planning duties.[8]

Sublett stood out in her Director role, bringing numerous honors to MHK.  Her facility was named Outstanding Personal Care Home Facility for 2011-2012, the same year that Sublett was personally awarded Statewide Winner for Personal Care Home Caregivers and Central District Personal Home Caregiver of the Year.[9]  In 2016, MHK nominated Sublett for the 2016 Nursing Excellence Award.[10]  That same year, Sublett was honored as Outstanding Services

---

[1]   *See* Whitaker Dep., p. 36,; s*ee also* Masonic Homes of Kentucky Website, http://www.masonichomesky.com/, site last accessed Mar. 1, 2021 (confirming "over 600 professionals" on staff).
[2]   *See generally* Masonic Homes of Kentucky Website, http://www.masonichomesky.com/.
[3]   *See generally id.*
[4]   Ex. 1 to Def.'s Mot. S.J., *Long-term employee spotlight: Kim Sublett*, p. 1.
[5]   *See* Affidavit of Kimetta Sublett, Mar. 3, 2021, ¶ 2 (attached hereto as Exhibit 1).
[6]   *See id.*, ¶ 3.
[7]   *See id.*, ¶ 4.
[8]   *See id.*, ¶ 5.
[9]   *See id.*, ¶ 6.
[10]   *See id.*, ¶ 7; *see also* Attachment A to Sublett Aff., Nomination Form.

Award for Community Living by the Leading Age of Kentucky Association.[11]  Over these years, MHK featured Sublett in promotional materials, extolling her "humble demeanor" and "exceptional customer service."[12]

Sublett began to feel the effects of age and a worsening medical condition by 2017, however.[13]  She recalls that she had to "slow down my pace a bit, physically."[14]  At 57, she was experiencing respiratory issues.[15]  On January 18, 2017, Sublett had a lung scan performed, and her doctors confirmed in a report that she had moderate emphysema.[16]

Sublett told MHK's agents about her diagnosis.  Principally, she informed Human Resources Director Paula Walker, showing Walker the lung scan to demonstrate that her diagnosis had been verified by doctors.[17]  A year later, when she received follow-up diagnostics confirming that her emphysema was worse, Sublett imparted those results to Walker as well.[18]  Sublett expected that Walker was reporting the disclosure on to Chief Human Resources Officer Trasee Whitaker and Administrator Nick Cooper, who were Walker's direct reports.[19]  None of these MHK agents asked for more documentation or followed up with Sublett about verifying her diagnosis.[20]

Aside from Human Resources, Sublett told several other MHK employees, particularly those who needed to know that she needed to be excused from participating in activities made difficult by the emphysema.  Sublett specifically recalls telling Cooper and Chief Executive Officer Gary Marsh, in order to explain that she could not participate in a yearly campus-cleanup

---

[11]  *See id.*, ¶ 8.
[12]  *Id.*, ¶ 9; *see also* Attachment B to Sublett Aff., "Long-Term Employee Spotlight."
[13]  *See* Ex. 1, Sublett Aff., ¶ 10.
[14]  *Id.*
[15]  *See id.*
[16]  *See id.*, ¶ 11; *see also* Attachment C to Sublett Aff., 2017 Lung Scan.
[17]  *See* Ex. 1, Sublett Aff., ¶ 12.
[18]  *See id.*
[19]  *See id.*
[20]  *See id.*, ¶ 13.

event called the "Great Day of Service" that took place in the spring of 2017.[21]  Marsh responded

that he was sorry to hear of Sublett's condition, and Cooper did not respond at all.[22]  In hindsight,

Sublett has testified that she would not have ever disclosed her disability if she had thought it

would cost her status in the Director role.[23]

Later in 2017, Sublett was adjusting to her disability while still executing the Director

duties.  She did not seek a transfer or change of role, nor did she want such a change.[24]  In

December of 2017, though, Sublett was told that Marsh and Chief Operating Officer JScott Judy

wanted to meet with her, on short notice, and at the end of the day.[25]  Sublett immediately feared

that she would be fired, and several co-workers even commented that they thought she would be

as well, since the short-notice, late-day meeting was the common delivery method for such news

to MHK employees.[26]

Instead, Marsh and Judy told Sublett that she was going to be taken out of the Director

role at Pillars, and that they were considering moving her to a Resident Services Manager

position at another facility, Miralea.[27]  As they explained it to Sublett, she would be subordinate

to another facility's Director, an inferior position with less respectability and less prestige.[28]  She

asked if she had a choice about losing the Pillars position, or whether she could keep that job.[29]

Marsh responded, "It's not an option."[30]  Sublett was "scared and upset" by the news.[31]  She felt

humiliated about being demoted, but she was also wounded by the apparent lack of faith from

---

[21] See id., ¶ 14.
[22] See id.
[23] See id., ¶ 15.
[24] See id., ¶ 16.
[25] See id., ¶ 17.
[26] See id.
[27] See id., ¶ 18.
[28] See id.
[29] See id., ¶ 19.
[30] See id.
[31] Id., ¶ 20.

the executives.[32]  As a consolation, Marsh promised that Sublett would receive a raise from her

$65,000 annual salary to $75,000 in the inferior position.[33]  The executives did not tell Sublett

that the outgoing RSM, Mike Truax, had been paid $97,000 for doing the same job.[34]  Nor did

they tell her that when Truax was elevated to Director of Miralea, a peer position to her Pillars

role, he would be paid $107,000 – more than forty thousand dollars more than Sublett had been

paid in her own Director role.[35]  Sublett endured the demotion, as the only alternative described

to her was unemployment.[36]  Grateful to still have a job, Sublett sent an email thanking Marsh

and Judy for letting her preserve her dignity.[37]

Sublett's Director role at Pillars was given to Chris Just.[38]  Just is ten years younger than

Sublett, having been born in 1970.[39]  He is not considered disabled by MHK.[40]  Just was paid

$80,000 annually when he assumed the role.[41]  He had no tenure or seniority at MHK, as he was

a new hire in 2018.[42]

The Resident Services Manager, sometimes referred to in MHK documents as the

"Resident Relations Manager," had the general job responsibility to help the residents transition

to facility life, while incorporating resources and strategies to maintain resident independence.[43]

---

[32]  *See id.*
[33]  *See id.*, ¶ 21.
[34]  *See id.*
[35]  *See id.*, ¶ 22.
[36]  *See id.*, ¶ 23.
[37]  *See id.*, ¶¶ 25-26.
[38]  *See* Def.'s Ans. Pl.'s Interrogatory No. 16 (entire document attached hereto as Exhibit 2).  Notably, MHK has since departed from this admission, positing in its Motion that the Director position was eliminated.  *See* Def.'s Mot. S.J., DN 50, p. 3.  Its prior admission is clear, however, that the position still existed at the time it was taken from Sublett and given to her comparator.  Grove Point, the additional duties eventually given to Just alongside the Pillars duties, was not yet completed at the time Sublett was removed as Pillars Director.  *See* Ex. 3 to Def.'s Mot. S.J., Whitaker Aff., ¶ 7 (conceding Grove Point was not completed until August of 2018, which was after Sublett's employment was terminated).  At the time Sublett was replaced by Just, which is the focus of this case, Just took over the exact duties Sublett had previously performed.  Subsequent elimination of the Director role is not salient to the instant Motion, which deals with events that took place before August of 2018.
[39]  *See* Ex. 2, Def.'s Resp. Pl.'s Req. Admission No. 8.
[40]  *See* Ex. 2, Def.'s Resp. Pl.'s Req. Admission No. 9.
[41]  Ex. 6 to Def.'s Mot. S.J., C. Just Payroll.
[42]  Ex. 1, Sublett Aff., ¶ 27.
[43]  *See* Deposition of Mike Truax, Aug. 28, 2020, pp. 138-39 (attached hereto as Exhibit 3).

In spring of 2018, Sublett assumed that role, under newly promoted Miralea Director Mike Truax.[44]

Truax, who currently still serves as Director of Miralea, is paid $107,000 annually to serve MHK as a facility Director.[45] Before that, he was Resident Services Manager for Miralea, and he was paid $97,000 in that role.[46] Truax has testified that the RSM job did not change in any meaningful way when he handed it off to Sublett, and that he cannot explain or justify the pay disparity.[47] He has conceded, however, that it is not acceptable to pay another person less to do the same job.[48] He has also testified that there is no reason for the Director of any facility to be compensated on a higher level than the Director of a sister facility.[49] When comparing the Miralea and Pillars Director roles in terms of prestige and opportunity, "it would be on the same [plane], or same playing field, so to speak[.]"[50]

While it is undisputed that Sublett was moved from the Pillars Director role to the Miralea RSM role in the spring of 2018, there is disagreement among MHK's witnesses, about *when* the decision was made and *by whom*. Truax has testified that *he* made the decision to put Sublett in the RSM role after a meeting on March 7, 2018, and not months earlier.[51] MHK has stated in its Motion, though, that Gary Marsh and JScott Judy made the decision in December of 2017, which Truax has specifically denied.[52] Marsh and Judy have not supplied any testimony in this action, and there is thus no evidence to support the contention that the final decision was made by Marsh and Judy in December of 2017.

---

[44] Ex. 1, Sublett Aff., ¶ 28.
[45] *See* Ex. 3, Truax Dep., p. 133; *see also* Errata Sheet of Mike Truax (correcting previously misstated salary) (attached hereto as Exhibit 4).
[46] *See* Ex. 3, Truax Dep., p. 85.
[47] *See id.* at 128-30.
[48] *See id.*
[49] *See id.* at 105.
[50] *Id.*
[51] *See id.* at 124-25.
[52] *See id.*; *see also* Def's Mot. S.J., DN 50, p. 4 (citing Ex. 8 to Def.'s Mot. S.J., which are emails that do not inform the premise for which they are cited).

Miralea Human Resources Director Brandi Muir, who knew very little about Sublett personally, believed Sublett's level of experience would be valuable to the Miralea facility.[53] Sublett assumed a good attitude, cheerfully referring to Miralea as her "new family" in the lead-up to assuming the RSM role.[54]   Muir was notified about Sublett's disability when Sublett assumed the RSM role at Miralea.[55]   She did not ask for any documentation, nor did she supply Sublett with any information about an accommodation process.

Sublett has testified that she ensured that Muir knew about her condition in case she suffered a medical emergency.[56]   Sublett experienced difficulty with walking and breathing due to her disability, particularly in high temperatures.[57]   Sublett asked both Truax and Marty Hess, a facilities worker, to help her find a parking solution so that she did not have to park far from the building.[58]   Although Truax did nothing to help her, Hess engaged his supervisor, Tom Candler.[59]   Candler had helped Sublett obtain a special parking sticker that would accommodate her medical needs while she was at Pillars, and he commented to her that she should have already had the pass due to her position.[60]   Sublett received no further help, however, as a Miralea worker.

Meanwhile, Truax asked Sublett several times to park further from the entry door, where he parked his vehicle.[61]   Embarrassed, Sublett told Truax that her medical limitations kept her from following his lead in parking.[62]   Thus, even though the parking issue had a simple solution, Truax continued to belabor his opinion that Sublett should not be accommodated.   Construction

---

[53] Deposition of Brandilyn Muir, Aug. 27, 2020, p. 59 (attached hereto as Exhibit 5).
[54] Ex. 10 to Def.'s Mot. S.J, Emails About Sublett's Family Loss.
[55] *See* Ex. 1, Sublett Aff., ¶ 29.
[56] *See id.*, ¶ 30.
[57] *See id.*, ¶ 31.
[58] *See id.*, ¶ 32.
[59] *See id.*
[60] *See id.*
[61] *See id.*, ¶ 33.
[62] *See id.*

on the MHK campus created additional challenges from time to time, but due to Truax's unwillingness to help and frequent complaints to Sublett about her parking, Sublett felt she was on her own to come up with daily solutions.[63]  On days when she had to park far from her office, she had to stop and rest at intervals between her car and the office.[64]  When an open office nearer to the entrance was available, Marsh promised Sublett that she could have it, to cut down her travel distance from the parking lot.[65]  When Sublett mentioned the promise to Truax, he responded, "That probably won't happen[,]" and it ultimately did not.[66]

Chief Human Resources Officer Trasee Whitaker has testified that Truax was trained in the proper procedure that he was supposed to follow when receiving notification of a possible disability-related need.[67]  Whitaker described a process by which the supervisor of Human Resources person receiving notice of a disability-related need is supposed to request paperwork – specifically, a doctor's note describing the disability – even if the impairment is "visible" to MHK.[68]  Thus, it was incumbent upon Truax to have requested documentation in conjunction with Sublett's various requests for accommodation.

When construction around the MHK campus made it more difficult for Sublett to park nearby, she would sometimes use a resident parking spot associated with a vacant unit – a spot that would otherwise have been empty due to the unit's vacancy.[69]  No reason was given as to why Sublett could not have been accommodated.  Whitaker has confirmed that there would have been no hardship associated with a parking accommodation for Sublett.[70]  At the close of discovery, MHK had articulated no hardship of any kind related to Sublett's parking requests.

---

[63] *See id.*, ¶ 34.
[64] *See id.*
[65] *See id.*, ¶ 35.
[66] *Id.*
[67] *See* Deposition of Trasee Whitaker, Aug. 26, 2020, pp. 66-67 (attached hereto as Exhibit 6).
[68] *Id.* at 75-76.
[69] *See* Ex. 1, Sublett Aff., ¶ 36.
[70] *See* Ex. 6, Whitaker Dep., p. 122.

8

These were not the only difficult interactions Sublett and Truax had related to the emphysema. Truax has conceded the existence of two conversations about Sublett's disease, pre-termination.[71] One of the conversations took place as Sublett and Truax were climbing a staircase and Sublett noted her respiratory difficulty.[72] Truax has confirmed that he understands emphysema to be a "disease of the lungs" and, particularly, a condition marked by "diminished airflow to the lungs."[73] He also believes that the disease can be "exasperated" to the point that it interferes with respiratory functions in a significant way.[74]

Despite this knowledge, Truax did not display sensitivity to Sublett's needs. At one point, when Sublett and Truax were sharing an office, the air conditioning unit stopped working.[75] When Sublett told Truax, he laughed and joked that she had turned the heat on.[76] Truax would not have the unit checked, so Sublett assumed the additional responsibility of having the air conditioning fixed to alleviate her emphysema-related distress. Worse, however, was his response to her needs related to lifting things and pulling furniture and equipment.

The Director of a facility formulates the duties and job description of the Resident Services Manager in the facility, with input from the Vice President of Independent Living.[77] At the beginning of Truax's tenure as Director over Sublett's RSM role, the job description was memorialized in a document last revised in July of 2012.[78] The job description at that time reflected a job that consisted of sitting at a desk more than two-thirds of the time.[79] Truax has testified that he wanted to "revamp" the duties to reflect a more active role.[80]

---

[71]  *See* Ex. 3, Truax Dep., pp. 172-74.
[72]  *See id.* at 172-73.
[73]  *Id.* at 168.
[74]  *Id.*
[75]  *See* Ex. 1, Sublett Aff., ¶ 37.
[76]  *See id.*
[77]  *See* Ex. 3, Truax Dep., p. 98.
[78]  RSM Job Descriptions, MH-SUBLETT 000150-000154, 000156-000159 (attached collectively hereto as Exhibit 7).
[79]  *See id.*
[80]  Ex. 3, Truax Dep., pp. 135-38.

Sublett contends that she asked to be excused from activities like arranging (lifting, pushing, and pulling) furniture, lifting and carrying trays of food and drinks, and waiting on residents because they were too physically strenuous.[81]   She told Truax, "I am almost 59 years old, and I have emphysema."[82]   Sublett specifically cited her physical limitations as the reason she could not perform those tasks.[83]   Truax would not relieve her from the tasks, responding instead on a single occasion, "I'll help you."[84]   On that one occasion, Truax helped Sublett with the duties that were causing her distress.   Thereafter, he continued to send her tasks that included the duties from which she had requested to be excused.[85]   Sublett was not told, when she was assigned the difficult duties, that she had any choice to decline them if she wanted to keep her job.[86]   Sublett continued to attempt the tasks Truax assigned her, and she alerted Truax to her episodes of weakness and respiratory distress when they occurred.[87]   Truax never proposed any other accommodations or solutions, nor did he ask for any documentation.[88]

Truax has admitted that Sublett asked to be excused from the RSM duties that involved serving food in the Juleps restaurant.   Truax specifically recalls that Sublett expressed, "I can't keep doing this.  This is too hard."[89]   To Truax's recollection, that conversation occurred in May, sometime after the Kentucky Derby Festival.[90]   At that point, "she indicated the physical toll that it was taking on her."[91]   At that point, Truax did not warn Sublett of any thoughts or plans to change the RSM role requirements.[92]   He also did not excuse her from the physically demanding

---

[81] *See* Ex. 1, Sublett Aff., ¶ 39.
[82] *Id.*
[83] *See id.*
[84] *Id.*
[85] *See id.*, ¶ 40.
[86] *See id.*, ¶ 41.
[87] *See id.*, ¶ 42.
[88] *See id.*, ¶ 43.
[89] Ex. 3, Truax Dep., p. 171.
[90] *See id.*, pp. 174-75.
[91] *Id.* at 176.
[92] *See id.* at 177.

requirements of the RSM role such as setting up rooms for activities, rearranging furniture, and walking distances.[93]   At no time did Truax tell Sublett that he considered any of those tasks "voluntary," such that she could decline them.[94]

Although Sublett and Truax have confirmed this conversation took place, Human Resources has no documentation of the accommodation request. Trasee Whitaker testified that "[i]t wouldn't be important to document the conversation."[95]   As noted above, however, Truax was specifically trained to obtain documentation from an employee who disclosed a disability and requested accommodation, and that he knew he was supposed to follow that process when asked for an accommodation.[96]   Truax did not follow Sublett's discussion of the "physical toll" she was experiencing with any discussion or conversation in furtherance of an interactive process.[97]

A few days after this May discussion, Sublett began to notice increased scrutiny from Truax, as though he was "nit-picking" her.[98]   On one occasion, Sublett was at Miralea visiting with some of her friends who had come by to eat lunch, and she used the Spanish term "hucha" to her friends – a term that means "money."[99]   Soon after, Truax approached her and told her that he had heard that she used the term "hoochies" – a derogatory term for women.[100]   Sublett explained what the term was that she actually used, and Truax seemed to accept it.[101]   Although this was unnerving, Sublett attempted to take it in stride, and she still attempted to make Truax happy.[102]

---

[93]   *See* Ex. 1, Sublett Aff., ¶ 38.
[94]   *See id.*
[95]   Ex. 6, Whitaker Dep., p. 68.
[96]   *See id.* at 66-67.
[97]   *See* Ex. 1, Sublett Aff., ¶ 38.
[98]   *Id.*, ¶ 44.
[99]   *Id.*
[100]  *Id.*
[101]  *See id.*
[102]  *See id.*

A few weeks later, Truax claims to have received various complaints about Sublett.  First, he claims to have heard that Sublett disclose private information about a resident over the phone at Miralea – specifically, by saying a resident's "functional abilities" into the phone.[103]  Truax addressed this mid-June 2018 encounter with Sublett around that same time, and she assured Truax that it was not true, that she had actually been discussing broadly the services provided by Miralea – and not any information related to any single resident.[104]  Truax responded, "Okay."[105]  No one reported the alleged "HIPAA" violation to the resident affected, the resident's family, law enforcement, or the Secretary for Health and Human Services.[106]

Finally, Sublett was accused of using vulgarity to a co-worker at the concierge desk in late June of 2018.  Brandi Muir has testified that under MHK policies and practices, people who witness encounters of this sort are supposed to be interviewed.[107]  When Truax asked Sublett about the incident, she told him to talk to Reed, who had been right there at the concierge desk during the alleged encounter.[108]  Although Truax concedes that it is necessary to proceed "on facts" when terminating a person, he also admits that he did not interview Gertrude Reed, one of the workers who was present at the encounter.[109]  If he had done so, she would have told him that Sublett did not use any profanity, and that there had been no foul language violation.[110]

---

[103]  Ex. 3, Truax Dep., p. 161.
[104]  Ex. 1, Sublett Aff., ¶ 45.
[105]  *Id.*
[106]  *See* Ex. 3, Truax Dep. at 160-67.  There is residual disagreement between MHK's witnesses as to what the HIPAA accusation actually is.  Trasee Whitaker has testified that she believed Sublett violated the federal law by speaking a resident's name on a telephone call at the front desk of the Miralea facility.  *See* Ex. 6, Whitaker Dep., pp. 146-48.  Whitaker was very clear that Mike Truax identified the instance as a HIPAA violation.  *See id.* at 155.  For his part, Truax claimed that the information shared over the phone was not a name, but information about a resident's functional abilities.  *See* Ex. 3, Truax Dep., p. 161.  There is thus a dispute about what the HIPAA violation is alleged to have been.
[107]  Ex. 5, Muir Dep., p. 40.
[108]  Ex. 1, Sublett Aff., ¶ 46.
[109]  Ex. 3, Truax Dep., pp. 207-09; *see also* Affidavit of Gertrude Reed, Sept. 3, 2020, ¶¶ 1-19 (attached hereto as Exhibit 8).
[110]  *See id.*, ¶ 10.

MHK infractions are categorized into "levels" of severity in the handbook.[111] Level I infractions are "minor" infractions, such as parking violations or minor disrespect of a supervisor.[112] Progressively, five Level I offenses result in termination.[113] Level II offenses are "more serious," such as improper documentation in medical records, inconsiderate care of a resident, and general use of vulgar language.[114] Progressively, three Level II offenses will lead to termination.[115] Level III offenses are the "serious" violations that can result in immediate termination, without any expectation of progression or warnings.[116]

Chief Human Resources Officer Trasee Whitaker has conceded that under the employer's policies, there is an expectation that all infractions are addressed timely.[117] Nonetheless, Truax waited about a month after the concierge desk incident to cobble together a performance improvement plan (PIP) out of the May and June allegations.[118]

Muir has denied participating in a preliminary meeting to formulate the PIP.[119] Truax, however, claims to have had a preliminary meeting with Muir and Whitaker to discuss how to proceed.[120] This inconsistent testimony from MHK's witnesses aside, the employer has admitted that it is only aware of four alleged violations of policy by Sublett in response to a contention interrogatory: 1) In May of 2018, Sublett "used profanity towards her co-workers within earshot of residents and their families in the Miralea restaurant area"; 2) In June of 2018, Sublett "discussed resident health information in a common area, creating possible HIPPA [*sic*] complications"; 3) Also in June of 2018, Sublett "again used foul language in a conversation

---

[111] *See* Offenses Policy and Addendum C, MH-SUBLETT 000041, 000079-000081 (attached hereto collectively as Exhibit 9).
[112] *Id.*
[113] *See id.*
[114] *Id.*
[115] *See id.*
[116] *Id.*
[117] *See* Ex. 6, Whitaker Dep., p. 134.
[118] *See generally* Performance Improvement Plan, MHK 0438-0440 (attached hereto as Exhibit 10).
[119] *See* Ex. 5, Muir Dep., p. 80 ("there was only an email").
[120] *See* Ex. 3, Truax Dep., pp. 177-80, 184.

with a Miralea co-worker"; and 4) Sublett "refused to agree to the Performance Improvement Plan" and was "defiant" as to the allegations against her.[121]  The same contention interrogatory requested citation to any policies or rules governing such infractions, and as of the close of discovery, MHK had identified none in its Answers.[122]  It also took no position on the identity of any person that determined whether any policy was violated.[123]

Truax confronted Sublett with the PIP on June 24, 2018.  Truax has testified that the PIP was made up of three criticisms.  First, it referred to an alleged Level I offense (the "hucha" remark) that he had previously addressed informally, but adequately, with Sublett.[124]  Second, it referred to the concierge desk encounter.[125]  Truax has taken the position that the alleged use of vulgarity was a Level II offense, but that he did not issue the final written warning required by the policy.[126]  Finally, the PIP referred to an allegation that Sublett had violated the Health Insurance Portability and Accountability Act (HIPAA), which is not specified as being any "level" of offense in the handbook.[127]

The PIP required Sublett to agree to "Accountability and Ownership" related to "recognized areas for improvement."[128]  In Sublett's estimation, agreeing to the PIP meant agreeing that she had done each of the things she was accused of, such that she needed behavior modification training.[129]  Sublett protested that the allegations in the PIP were not true, and that she could not agree that they were, but Truax retorted, "I don't know why you just won't sign it so we can move on!"[130]  Sublett repeated that it was based on things that were false, and she

---

[121] Ex. 2, Def.'s Ans. Pl.'s Interrogatory No. 4.
[122] *See generally id.*
[123] *See id.*
[124] *See id., see also* Truax Dep., pp. 189-91.
[125] *See* Ex. 10,  Performance Improvement Plan, MHK 0438-0440.
[126] *See id.*; *see also* Ex. 9, Offenses Policy and Addendum C, MH-SUBLETT 000041, 000079-000081.
[127] *See* Ex. 10,  Performance Improvement Plan, MHK 0438-0440; *see also* Ex. 9, Offenses Policy and Addendum C, MH-SUBLETT 000041, 000079-000081.
[128] *See* Ex. 10,  Performance Improvement Plan, MHK 0438-0440.
[129] *See* Ex. 1, Sublett Aff., ¶¶ 47-48.
[130] *Id.*, ¶ 49.

began to cry.[131]  She was scared that agreeing to the false statements would create a stigma that she would never be able to "shake."[132]  She did not believe it was good leadership to lie, which was what agreeing to the false allegations would be doing.[133]  She felt that she was being "set up" and that neither Truax nor Muir had her or the residents' interests at heart.[134]  She did know, however, that Reed had not been interviewed, as she had talked with Reed about that very matter.[135]  The PIP document lists the June 2018 incident as having been investigated: "Statement received from all involved employees."[136]  Sublett did not understand why Truax was asking her to agree with things that were false, and she was in fear that doing so would endanger her nursing license, especially with respect to the allegations of HIPAA violations.[137]

Still, Sublett was never hostile.[138]  She was "quiet, hurt, and tearful" throughout this meeting.[139]  Truax said he would agree to "table" the conversation until the next day, and Sublett agreed to talk about it again in that manner.[140]

In the time before the next meeting, Sublett agonized over MHK's actions.  She knew she could not agree with a false allegation of a HIPAA violation.[141]  She prayed for a better outcome the next day.[142]

The next day, June 25, 2018, Sublett met with Truax and Muir again, and Trasee Whitaker attended as well.[143]  Truax again presented the same PIP, unchanged, and Sublett

---

[131]  *See id.*, ¶¶ 49-50.
[132]  *Id.*, ¶ 50.
[133]  *See id.*
[134]  *Id.*
[135]  *See id.*, ¶ 51.
[136]  Ex. 10, Performance Improvement Plan, MHK 0438-0440
[137]  *See* Ex. 1, Sublett Aff., ¶¶ 52-53.
[138]  *See id.*, ¶ 54.
[139]  *Id.*
[140]  *Id.*, ¶ 55.
[141]  *See id.*, ¶ 56.
[142]  *See id.*, ¶ 57.
[143]  *See id.*, ¶ 58.

noticed that Whitaker also held a document.[144]   Truax again demanded that Sublett agree to the PIP document, and she again she that she would not, for the same reason she had stated the day before.[145]   Truax asked Sublett to leave the room, and she complied.[146]

Whitaker testified, in her capacity as Chief Human Resources Officer for MHK, that minor disrespect to a supervisor was a Level I offense.[147]   In some circumstances, Whitaker believes, disrespect could rise as high as a Level II offense.[148]   Although, as noted above, MHK has not taken a position as to any rules or policies that it believes Sublett violated Whitaker has testified that she believes Sublett committed the offense of "disrespect" in the PIP meeting because she would not sign the PIP.[149]

Sublett was called back into the room, where Truax asked her what he was supposed to do.  She responded, as a former Director herself, that Truax needed to "do what Directors do," by which she meant that Truax needed to do the right thing and be fair to her.[150]   Truax responded that he was terminating Sublett because she was not "a good fit."[151]   He did not allege that she had been insubordinate in any way.[152]

Sublett then learned that Whitaker showed up to the July 25th meeting with a "severance package" – a sheaf of documents that proposed terms of separation – and that was what had been in her hand through the first part of the meeting.[153]   Truax has admitted that he represented to Sublett that the meeting was "not disciplinary at all" but that he also had Whitaker bring the severance package "in the event that Kim would not willingly participate in the performance

---

[144]   *See id.*, ¶¶ 59-60.
[145]   *See id.*, ¶ 61.
[146]   *See id.*, ¶¶ 61-63.
[147]   *See* Ex. 6, Whitaker Dep., p. 137.
[148]   *See id.* at 138.
[149]   *Id.*
[150]   Ex. 1, Sublett Aff., ¶¶ 64-65.
[151]   *Id.*, ¶ 66.
[152]   *See id.*
[153]   *Id.*, ¶ 67.

improvement plan."[154]  Whitaker testified, though, that the decisions about whether Sublett had violated any policy sufficient to warrant a consequence were made by Truax, and that she did not have personal knowledge of the violations set forth in the PIP.[155]

Truax has admitted that Sublett accepted correction and conformed her conduct on every prior occasion he took issue with her performance.[156]  He testified that the July investigation of the June 2018 profanity incident differed from those prior incidents because Sublett disputed the truth of the accusations against her.[157]

In July of 2018, right after Truax terminated Sublett, he "revamped the job description" of the Resident Services Manager.[158]  Truax particularly wanted to change "the amount of standing and walking associated with that role."[159]  His revisions meant that the RSM role, the requirements of which had been less than one-third standing and walking, would become a job with standing and walking greater than two-thirds of the time.[160]  MHK thereafter advertised the vacant position as a much more physically demanding role, whereupon it hired a worker in her thirties.[161]

## SUMMARY JUDGMENT STANDARD

Summary judgment may only be granted if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. As the party moving for summary judgment, Defendant MHK bears the burden of showing the absence of a genuine issue of material fact as to at least one element of Plaintiff's claims.[162]  Only if Defendant

---

[154]  Ex. 3, Truax Dep., p. 196.
[155]  Ex. 6, Whitaker Dep., pp. 142-43.
[156]  *See* Ex. 3, Truax Dep., pp. 197-204.
[157]  *See id.* at 203-07.
[158]  *See id.* at 133-34.
[159]  *Id.* at 135.
[160]  *See id.*, at 135-38; *see also* Ex. 7, RSM Job Descriptions.
[161]  *See* Ex. 5, Muir Dep., p. 123
[162]  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

meets this burden must Plaintiff present evidence that reveals a genuine issue for trial.[163]  Any factual assertions must be supported through "the pleadings, the discovery and disclosure materials on file, and any affidavits."[164]  A factual dispute is "genuine" if a reasonable fact-finder could resolve the dispute in favor of either party.[165]  At the summary judgment stage, "credibility judgments and weighing of the evidence are improper."[166]

## ARGUMENT

### I.   SUBLETT STATES A STRONG CLAIM FOR DISABILITY DISCRIMINATION

Kimetta Sublett has alleged discrimination on the basis of her disability, emphysema. The Americans With Disabilities Act prohibits discrimination against disabled workers, such as terminating workers upon learning of disabilities, paying them less than non-disabled workers, and demoting them.[167]  Further, the Kentucky Civil Rights Act designates that it is an "unlawful practice for an employer . . . [to] discharge any individual, or otherwise discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because . . . the person is a qualified individual with a disability[.]"[168]  The KCRA is modeled after the Americans with Disabilities Act, which prohibits employment discrimination against a qualified individual on the basis of disability, so cases interpreting that body of law are instructive for deciding KCRA claims.[169]

### A.  Sublett States a *Prima Facie* Case of Disability Discrimination

In a discrimination case, the initial burden is on the plaintiff to show that she 1) has a

---

[163]  *See id.*
[164]  Fed. R. Civ. P. 56(c).
[165]  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).
[166]  *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018) (citing *Rorrer v. City of Stow*, 743 F.3d 1025, 1038 (6th Cir. 2014)).
[167]  *See generally* 42 U.S.C. § 12112(a).
[168]  KRS 344.040.
[169]  *See Brohm v. Jh Props.*, 149 F.3d 517, 520 (6th Cir. 1998).

disability; 2) is otherwise qualified for the position, either (a) without accommodation from the employer; (b) with an   alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation; and 3) that the worker suffered an adverse employment action because of the disability.[170]  As to the last element, adverse employment actions relate to "hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment,"[171] or any other "materially adverse change in the terms of [ ] employment."[172]  "Termination, decrease in wage or salary, change in title, diminished material responsibilities, or a material loss of benefits are all examples of a materially adverse change."[173]  Sublett can satisfy each element of a disability discrimination claim.

1.  <u>Sublett is Disabled Under the Law</u>

There are three separate ways to be eligible for protection as a disabled worker: 1) Having a physical or mental impairment that substantially limits one or more of the major life activities of the individual; 2) Having a record of such an impairment; or 3) Being regarded as having such an impairment.[174]  A plaintiff can proceed to trial without deciding which prong covers her.[175]

Sublett has a medical condition, emphysema.    It substantially limits her major life activities, including walking, lifting, pushing, pulling, breathing, and physical exertion.[176]  There

---

[170]  *See Henderson v. Ardco, Inc.*, 247 F.3d 645, 649 (6th Cir. 2001) (federal law); *Hallahan v. Courier-Journal*, 138 S.W.3d 699, 706-07 (Ky. App. 2004) (KCRA); *see also Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007); *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012).
[171]  42 U.S.C. § 12112(a).
[172]  *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 797 (6th Cir. 2004) (*en banc*).
[173]  *Mensah v. Mich. Dep't of Corr.*, 621 Fed. App'x 332, 334 (6th Cir. 2015) (citing *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 625 (6th Cir. 2013)).
[174]  42 U.S.C. § 12102(1); KRS 344.010(4).
[175]  *See, e.g., Doane v. City of Omaha*, 115 F.3d 624 (8th Cir. 1997), *cert. denied*, 522 U.S. 1048 (1998); *Harris v. H&W Contracting Co.*, 102 F.3d 516 (11th Cir. 1996).
[176]  "Examples of 'major life activities,' for purposes of defining 'disability' under Americans with Disabilities Act (ADA) and Kentucky Civil Rights Act (KCRA), include, among other things, *walking*, seeing, hearing, *performing manual tasks*, caring for oneself, speaking, *breathing*, learning, and working." *Ezell v. Renal Care*

is no dispute that she actually has this condition, and it is reflected in the 2017 lung scan that Sublett has testified she gave to Paula Walker in Human Resources in 2017.  Sublett qualifies under the first method of establishing rights as a disabled person – being actually disabled.  In its Motion, MHK does not deny the existence of a qualifying disability, but instead simply claims to have had no knowledge of Sublett's emphysema.

Sublett, however, told several MHK executives and managers about her disability, including Human Resources personnel and her supervisors.[177]  MHK admitted as much in discovery:

> **REQUEST [FOR ADMISSION] NO. 2:** Please admit that you understood Plaintiff to be an individual suffering from emphysema.

> **RESPONSE:** Admitted.[178]

Although some of MHK's agents may claim not to have been told, Sublett has consistently maintained that she disclosed her condition to them, and a jury will likely conclude that she did.[179]  Truax has admitted that he understood Sublett to have suffered from emphysema, and that he understands that it can significantly interfere with her breathing functions, at minimum.[180]  Thus, Truax regarded Sublett as a person with a disability, establishing that she has rights under the third method as well.

2.  Sublett Was Qualified for Her Job

Sublett was qualified for each of the jobs she held, particularly the Director job that she successfully held for many years before her demotion.  Sublett received awards and accolades

---

*Gp., Inc.*, 2018 U.S. Dist. LEXIS 74697, * 36 (W.D. Ky. 2018) (quoting *Brown v. Humana Ins. Co.*, 942 F. Supp. 2d 723, 731 (W.D. Ky. 2013) (emphasis added).

[177]  *See* Ex. 2, Def.'s Resp. Pl.'s Req. Admission No. 2.

[178]  *Id.*

[179]  It is unclear why MHK contends, in its Memorandum in Support of Motion for Summary Judgment, that decision-maker Mike Truax did not know about Sublett's emphysema.  Truax has testified to having known of Sublett's emphysema, and in his affidavit tendered by Defendant, Truax does not qualify or retract any of his prior admissions.  In order to convince a jury that Truax did not know, about Sublett's disability, as Defendant presently claims, MHK will have to impeach its own witness.

[180]  *See* Ex. 3, Truax Dep., pp. 168-69.

in the Director role, and MHK even nominated her for more awards. Unsurprisingly, qualification is not in dispute in Defendant's instant Motion. Moreover, MHK does not claim that any of the job duties Sublett struggled with were essential functions of the job that could not be adjusted, going so far as to concede that they were "voluntary" and that she should have been excused from them without issue.

### 3.   Sublett Suffered Adverse Employment Actions

Sublett suffered three distinct adverse actions. First, she was severely underpaid when compared to her non-disabled counterparts. As a Director she was paid significantly less ($65,000) than her non-disabled comparators, Director Chris Just ($80,000 beginning salary) and Director Mike Truax ($107,000). When she replaced Truax as Resident Services Manager, she was paid $75,000, which was $22,000 less than Truax had been paid – or, viewed differently, only 77.32% of Truax's RSM pay. Under the plain language of the ADA, disparate compensation is a barred discriminatory action.[181] The KCRA also specifies compensation as a measure of discrimination.[182]

Second, Sublett was taken out of her Director role and reassigned to the inferior Resident Services Manager role. Mike Truax conceded that the Director of Pillars role was on par with the Miralea Director role, and that the RSM role was subordinate to it. There can be no real dispute that Sublett suffered diminished material responsibilities, prestige, and authority in the demotion to RSM. Truax testified that his own move from RSM to Director was a "promotion."[183] He further testified that the transition from RSM and Director was due to "[o]pportunity for promotion."[184] He has acknowledged that the Director position is eligible for

---

[181]   *See* 42 U.S.C. § 12112(a).
[182]   *See* KRS 344.040.
[183]   Ex. 3, Truax Dep., p. 104.
[184]   *Id.* at 103.

further promotion to a Vice President position.[185]  Particularly as this case involves a person in the RSM role being fired by a Director, there can be no real dispute that the RSM position is inferior.

MHK relies solely on the increase in pay that Sublett received in 2018 to claim that the RSM role was somehow a mere "transfer" rather than a demotion.  Critically, however, Sublett was *still paid less than her non-disabled peers were paid to do the same job*.  Pay disparity is also an adverse action that amounts to discrimination.[186]  Being paid less than a non-disabled comparator is still an adverse work condition.  Truax has conceded that there was no reason that Sublett was paid less to do the same job.[187]

Finally, Sublett was terminated, which is the ultimate adverse action, since it removed her from gainful employment entirely.  MHK does not dispute that termination is an adverse employment action, nor could it credibly attempt to do so.

### 4.  Sublett's Protected Status Caused Her Adverse Actions

Causation is apparent in a few ways.  First, the failure of MHK to follow its own investigation and documentation policies is evidence of discriminatory intent.[188]  MHK did not bother to investigate Sublett's defenses to the accusations against her.  Even after this suit began, and Gertrude Reed's evidence was presented to MHK, it has made no effort to learn that she could have absolved Sublett, confirming that the impetus for the PIP was a false accusation.  The jury can conclude that MHK has never cared about that evidence because it was determined to separate Sublett from employment.

Next, the temporal proximity between Sublett's disclosures and her adverse actions are

---

[185]   *See id.* at 98, 113-14.
[186]   *See* 42 U.S.C. § 12112(a).
[187]   *See* Ex. 3, Truax Dep., pp. 128-30.
[188]   *See Nabozny v. Podlesny*, 92 F.3d 446, 455 (7th Cir. 1996) ("It is well settled law that departures from established practices may evince discriminatory intent") (citing *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 267, 50 L. Ed. 2d 450, 97 S. Ct. 555 (1977)).

notable.  Shortly after Sublett disclosed her disability to Truax, he began to criticize her for small things.  He also criticized her makeshift disability accommodation related to parking, telling her that she could not park close to the building.  He formulated a PIP, presented it to her, and fired her – all within a few months of Sublett's disclosure of her disability to Truax.  Truax has testified that Sublett's complaints that some job duties were "too hard" and taking a "physical toll" occurred in May, and by June, he was purporting to investigate allegations against Sublett.  This span of about a month is sufficiently close in time to satisfy the temporal proximity method of causation.[189]

More precisely indicative of discriminatory intent, though, is Truax's revamping of the RSM job description right after he fired Sublett.  Truax conceded that he revised the position to portray the job as one that was significantly more physical in nature.[190]  The job's stated essential functions went from more than two-thirds of the time sitting at a desk to more than two-thirds standing and walking.[191]  Brandi Muir has confirmed that the RSM job has never been that physical, in actuality, not even presently.[192]  Without an *actual* need for a more physically fit person, the jury can conclude that Truax's bias against physical disability was the reason for firing Sublett, as confirmed by the revision of the RSM description to prevent other disabled people from assuming the job.  This probably rises to the level of direct evidence, as it shows Truax's discriminatory intent related to the job itself.  And the comparator installed in the job, Shannon Wolfe, is not disabled, nor has she requested a disability accommodation.[193]  Similarly, Sublett's replacement as Pillars Director, Chris Just, is not known by MHK to be disabled.[194]

---

[189]  *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (three months' temporal proximity was "significant enough to constitute sufficient evidence of a causal connection"); *see also, Dollar Gen. Partners v. Upchurch*, 214 S.W.3d 910, 916 (Ky. App. 2006) (five months was sufficient).
[190]  Ex. 3, Truax Dep., pp. 135-38.
[191]  *See id.*
[192]  Ex. 5, Muir Dep., pp. 54-55.
[193]  *See id.* at 123-24.
[194]  *See* Ex. 2, Def.'s Resp. Pl.'s Req. Admission No. 9.

This circumstantial evidence of favorable treatment for non-disabled comparators will be important to the jury's determination of causation.

### B. MHK's Proffered Basis for the Adverse Actions Is Easily Exposed as Pretext

In a circumstantial evidence case, after the plaintiff demonstrates each element of a discrimination claim, the burden shifts to the employer to demonstrate a legitimate, non-discriminatory reason for termination.[195]  A plaintiff may respond with evidence of pretext. Although MHK has not supplied a proffered basis for the pay gap, and while it simply denies that Sublett was demoted, the employer concedes that it terminated Sublett in July of 2018, and it has attempted to advance a legitimate, non-discriminatory basis for that decision.  To establish pretext, a plaintiff must show that the proffered reason either: 1) had no basis in fact; 2) did not actually motivate the adverse employment action; or 3) was insufficient to motivate that action.[196]  "In evaluating pretext and the plaintiff's ultimate burden, the court should consider all evidence in the light most favorable to the plaintiff, including the evidence presented in the prima facie stage."[197]  As explained by the U.S. Supreme Court, proof that an employer's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination.[198]  Such proof will defeat summary judgment, as it permits "the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation."[199]

When it comes to MHK's severe underpayment of Sublett, MHK has not attempted to justify the disparity.  There can really be no sound explanation, as Truax was paid almost 65%

---

[195]  *See, e.g., McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).
[196]  *See Thomas v. Mech. Consultants, Inc.*, 655 F. Supp. 2d 756, 766 (2009) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).
[197]  *Peck v. Elyria Foundry Co.*, 347 F. App'x 139, 145 (6th Cir. 2009).
[198]  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).
[199]  *Id.*

24

more than Sublett for serving as a Director, and he could point to no superior qualifications or credentials that he possessed justifying the massive gap in pay.  He conceded that the positions were on par, such that there is no logic to undercompensating any single worker holding a Director job.  Even Chris Just, Sublett's replacement as Pillars Director who came in with no seniority was paid $15,000 more per year than Sublett.  MHK has no explanation for underpaying Sublett, let alone a legitimate, non-discriminatory basis.

As to demotion, MHK attempts to sidestep that discussion by simply claiming that Sublett was not demoted.  At trial, it appears that it will rely solely in its contention, unsupported by testimony at this stage, that Sublett asked to be moved to the inferior role.  This dispute of fact means that MHK will not offer the jury a proffered basis, and will instead hope to persuade it as to the truth of the employer's contention.  That matter escapes summary resolution by being squarely in dispute.

When it comes to termination, MHK sets forth its only proffered basis – that Sublett deserved to be fired for being "insubordinate and refus[ing] to cooperate to address performance issues."[200]  MHK collapsed to this position after discovery revealed that its other criticisms of Sublett lacked factual support.  Sublett disputed that she used profanity in MHK facilities or violated HIPAA, and her version of facts was supported by the lack of adequate investigation, the lack of documentation that was required under MHK policies, and the inconsistencies between the stories concocted by the MHK witnesses.  Other indicia of credibility indicate that the proffered bases were false, including the lack of any incident reports or forms reporting verbal abuse (which would have been required if Sublett had used profanity in front of a resident)[201] and the lack of any HIPAA privacy reports (which were mandatory under federal

---

[200]   Def.'s  Mot. S.J., DN 50, p. 2.
[201]   *See* Ex. 6, Whitaker Dep., 44-45, 138-39.

25

law if MHK had truly believed Sublett violated HIPAA).[202]   Further, MHK violated its own investigation policies by failing to interview Gertrude Reed with regard to the front desk incident – and then lied about it by completing a form that claimed she *had* been interviewed.   Thus, MHK retreated, in its Motion, to arguing insubordination.

As Brandi Muir testified, though, Sublett was "quiet" during the termination meeting, and she did not swear, raise her voice, or exhibit any behavior that would seem confrontational.[203]   Truax, the decision-maker, did not testify in his affidavit or deposition that *he* believed that Sublett was "insubordinate."[204]   MHK's Motion cites decision-maker Mike Truax's testimony for the proposition that Sublett was "hostile" and "defiant" in the July 25th meeting, but the cited portions of the deposition do not contain the word "hostile" or "defiant."[205] In fact, the entirety of Truax's deposition, produced as a searchable PDF exhibit with this Response, does not contain the words "hostile" or "defiant."[206]   Nor does his affidavit, tendered in support of MHK's Motion.[207]   There is simply no factual support for the contention.   Whether a person's "unwillingness" to admit to something she did not do rises to the level of subordination is a jury question, but it certainly is not reflected anywhere in MHK's written policies.

---

[202]   *See* Ex. 3, Truax Dep., pp. 162-65; *see also* 45 C.F.R. §§ 164.402, 164.404, 164.408.  Truax does not know whether any of the MHK facilities keep a log or documentation of HIPAA breaches, as contemplated by federal regulations, but he is sure that Miralea does not.  *See* Ex. 3, Truax Dep., p. 163-67 (reviewing mandatory reporting requirements under 45 CFR 164.404).  Truax did not investigate to see if the alleged sensitive information was overheard by any unauthorized person.  *See id.* at 161-62.  He did not notify the resident allegedly affected.  *See id.* at 162-63.  He did not notify any law enforcement agency.  *See id.* at 163.  He did not inform any federal agency.  *See id.*  He did not inform any state agency, such as the Office of Inspector General, Adult Protective Services, or the Nursing Board that licenses Sublett in her capacity as a nurse.  *See id.* at 193.  Truax has conceded that reporting suspected HIPAA violations "to appropriate state or federal authorities" is contemplated by MHK's employee handbook.  *Id.*  It is undisputed that none of those actions were taken with respect to the alleged HIPAA violation.
[203]   Ex. 5, Muir Dep., pp. 115-17.
[204]   The Deposition of Mike Truax, produced in full as an exhibit here, does not contain the word "insubordinate" or insubordination."  *See generally* Ex. 3, Truax Dep.  Neither does the affidavit supplied by Truax in support of MHK's Motion.  *See generally* Ex. 11 to Def.'s Mot. S.J., Affidavit of Truax.
[205]   Compare Def.'s Mot. S.J., DN 50, pp. 21-22, with Ex. 3, Truax Dep. pp. 178-80.
[206]   *See generally id.*
[207]   *See generally* Ex. 11 to Def.'s Mot. S.J.

Finally, Whitaker conceded that she appeared in the meeting with a severance document to fire Sublett, even before Sublett exhibited any of the behaviors that Whitaker claimed amounted to "serious disrespect" of Truax.  MHK will find it difficult to explain why Whitaker was prepared to document Sublett's termination for *something that had not yet happened when the severance document was created*.  This is sufficient to submit the case to a jury, which will assess credibility and render a determination that suits the evidence.

Moreover, though, MHK will have a problem showing the jury that any of the stated complaints were sufficient, under its own policies, to warrant dismissal.  Truax testified that he had already addressed with Sublett the complaints set forth in the PIP other than the front desk incident, and she had conformed her conduct to his satisfaction.[208]  The impetus for terminating Sublett, Truax testified, was that she would not agree to the PIP document that she contended was false.[209]  Whitaker, the person responsible for overseeing the rules in the employee handbook, has conceded that "serious disrespect" of a supervisor, which is what she believed Sublett exhibited in the PIP meeting, was a Level II offense.  There is no allegation that Sublett committed "serious disrespect" on any prior occasion.  Under MHK rules, the appropriate first-time sanction for a Level II offense is a final notice.[210]  Even second offenses are penalized by a warning of termination, rather than actual termination.[211]  Thus, this proffered basis will fail as an insufficient basis for the penalty Sublett suffered, which was immediate termination.

Finally, Truax conceded that for the residents of Miralea, a Resident Services Manager is "[a]bsolutely" vital to the functioning of the facility.[212]  It caused a hardship on those residents to go without Sublett's services, even for a month.[213]  For residents transitioning between

---

[208] *See Ex.* 3, Truax Dep., pp. 201-04.
[209] *See id.*, pp. 201-08.
[210] *See* Ex. 9, MH-SUBLETT 000041.
[211] *See id.*
[212] Ex. 3, Truax Dep., pp. 86-90.
[213] *See id.*

facilities due to changing level-of-care needs, the RSM is critical to continuity of care.[214]   A reasonable jury can conclude that no manager with residents' best interests at heart would sacrifice their needs for a Level II offense allegation, absent some underlying and prevailing desire to rid the workplace of the worker – such as bias or retaliation.

In sum, MHK has failed to foreclose any of the elements of the disability discrimination claims, and its proffered basis has been exposed as pretext.  Thus, a reasonable jury can conclude that MHK underpaid, demoted, and ultimately terminated Sublett due to her disability, or due to her disability combined with another illegal motive.

## II.     MHK IS LIABLE FOR FAILING TO ACCOMMODATE SUBLETT'S DISABILITY ACCOMMODATION REQUESTS

Not all disability discrimination claims involve disability accommodation requests. Some just involve bias against the disabled, as was discussed in the previous section.  When a disabled worker requests an accommodation, however, and when the employer does not follow the law in responding to that request, a failure-to-accommodate claim is possible.  Here, Sublett repeatedly asked for accommodations that were refused.   The jury is entitled to determine whether MHK's actions constitute a violation of state and federal accommodation law.

The elements of a failure-to-accommodate claim are: 1) The worker was disabled; 2) She requested an accommodation; 3) She was able to perform the essential functions of the job, with or without a reasonable accommodation; and 4) The employer, despite knowing of the request for an accommodation, did not provide the necessary accommodation.[215]  "Once the employee requests an accommodation, the employer has a duty to engage in an interactive process to identify the precise limitations resulting from the disability and potential reasonable

---

[214]  *See id.*
[215]  *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982-83 (6th Cir. 2011)

accommodations that could overcome those limitations."[216]

As set forth in the previous section, Sublett was disabled.  Sublett asked for a parking accommodation, and also to be excused from work duties that involved lifting, pushing, pulling, arranging furniture, and that sort of strenuous activity.  As MHK has characterized those activities as "voluntary," there appears to be no dispute that they were not the essential functions of Sublett's job, and that she was otherwise able to perform the job's duties.

MHK takes issue with the last element, claiming that it did not receive a request for an accommodation from Sublett.  Specifically, MHK complains that it had no way to know about Sublett's disability "because she never submitted any medical paperwork."[217]  This contention echoes a belief articulated by Chief Human Resources Officer Trasee Whitaker in her deposition, when she claimed that it was incumbent upon an employee to initiate the accommodation process by supplying a doctor's note:

> The employee is required to have a physician's statement documenting the medical condition, and then the accommodation, you know, depending on what the circumstances are, would – could be implemented.
> ******
> It would state that the employee does have a medical condition, and it would also state what – what restrictions that the employee is currently under medically.  And if it's anticipated that this is something that is, you know, temporary or if it is a condition that is lifelong, that helps us determine the accommodation.  So that would typically be what we would expect to see from a physician.[218]

Prevailing EEOC guidelines also confirm that a person attempting to receive a reasonable accommodation need not have documents in hand when initiating the conversation:

> 1.    How must an individual request a reasonable accommodation?
>
> When an individual decides to request accommodation, the individual or his/her representative must let the employer know that s/he needs an adjustment or change at work for a reason related to a medical condition.

---

[216] *Melange v. City of Center Line*, 2012 U.S. App. LEXIS11175, *84-85 (6th Cir. 2012) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) (internal quotation marks omitted).
[217] Def.'s Mot. S.J., DN 50, p. 15 (emphasis omitted).
[218] Ex. 6, Whitaker Dep., pp. 62-64.

> To request accommodation, an individual may use "plain English" and need not mention the ADA or use the phrase "reasonable accommodation."[219]

The dialogue is intended to continue, after that, with the *employer* asking questions to get the details that fill out the request:

> The employer and the individual with a disability should engage in an informal process to clarify what the individual needs and identify the appropriate reasonable accommodation. The employer may ask the individual relevant questions that will enable it to make an informed decision about the request. This includes asking what type of reasonable accommodation is needed.
>
> The exact nature of the dialogue will vary. In many instances, both the disability and the type of accommodation required will be obvious, and thus there may be little or no need to engage in any discussion. In other situations, the employer may need to ask questions concerning the nature of the disability and the individual's functional limitations in order to identify an effective accommodation. While the individual with a disability *does not have to be able to specify the precise accommodation*, s/he does need to describe the problems posed by the workplace barrier. Additionally, suggestions from the individual with a disability may assist the employer in determining the type of reasonable accommodation to provide. Where the individual or the employer are not familiar with possible accommodations, there are extensive public and private resources to help the employer identify reasonable accommodations once the specific limitations and workplace barriers have been ascertained.[220]

Thus, the EEOC has made clear that when specific details are not already available, additional discussions are required and must be facilitated *by the employer*. From there, a worker can obtain documentation, if necessary, but she is not required to prophylactically address all possible interactive process questions with a physician's note.  In fact, MHK's written policies seem to acknowledge that a written doctor's note is not needed to initiate the conversation, stating simply, "You *may* be requested to provide medical information or to submit to a medical examination by a physician chosen by MHKY to assist us in evaluating and accommodating your

---

[219] EEOC Enforcement Guidance, Requesting Reasonable Accommodations (available online at https://www.eeoc.gov/policy/docs/accommodation.html#requesting) (site last accessed Feb. 5, 2021).
[220] *Id.*

disability."[221]  The conditional term "may," under the common meaning parlance  forth in the Oxford English Dictionary Online, indicates "possibility" rather than requirement.

Through Whitaker, MHK suggests that an employer can avoid its obligations to engage in the interactive process by obligating the employee to affirmatively obtain medical paperwork on her own, sufficient to satisfy MHK's unarticulated questions. As set forth above, that is not the prevailing legal standard.  It is likely that Whitaker's misapprehension of the applicable law is the reason that MHK has failed to follow it.  A reasonable jury can so conclude.

Whether by incompetence or intention avoidance, there is no dispute that MHK did not engage in the interactive process after learning of Sublett's needs.  If the employer fails to participate in the interactive process in good faith, it faces liability if a reasonable accommodation would have been possible.[222]  From Whitaker's own admissions, there was no hardship associated with the requested accommodations, so liability on this claim is strong.

Once the prima facie failure-to-accommodate case is established, the burden shifts to the defendant to prove that the "challenged job criterion is essential" or that the "proposed accommodation will impose an undue hardship upon the employer."[223]  Here, MHK's Chief Human Resources Officer has conceded that the accommodations that Sublett claims to have requested would not have imposed hardship on the company.[224]  Thus, this final inquiry is moot.

At trial, a jury will need to determine whether to believe Sublett and Truax when they testify that Sublett asked for a closer parking spot and to be excused from physically strenuous duties such as waiting tables, and that she did so while discussing her emphysema and that it was

---

[221]  Disability Accommodation Policy, MH-SUBLETT 000053 (attached hereto as Exhibit 11) (emphasis added).
[222]  *Lafata v. Church of Christ Home for Aged*, 2009 U.S. App. LEXIS 10825, *15 (6th Cir. 2009) (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (*en banc*), judgment vacated on other grounds, 535 U.S. 391, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002)).
[223]  *Kleiber*, 485 F.3d at 869.
[224]  *See* Ex. 6, Whitaker Dep., p. 122.

taking a "physical toll" and "too hard."[225]   The jury will then need to determine whether these requests related to Sublett's emphysema, which both Sublett and Truax recall to be the case. From there, the jury will have to determine whether MHK's refusal to engage in an interactive process thwarted a possible workable accommodation.   There is nothing else in dispute, and there is ample evidence to support jury findings in Sublett's favor on those queries.

### III.    SUBLETT'S AGE DISCRIMINATION CLAIM MUST GO TO A JURY

Sublett, a fifty-eight-year-old worker, experienced discrimination when compared to the more favorable treatment of three younger comparators.  Sublett began employment with MHK when she was in her twenties, and she was lauded and celebrated for over thirty years – until she was older, at which point she was replaced by younger workers.  She has thus sought relief under a theory of age discrimination.

The Kentucky Civil Rights Act renders unlawful any of the following employer practices:

> To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's [...] age forty (40) and over[.][226]

Courts analyze age discrimination claims under the KCRA consistently with claims formulated under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34.[227]  A plaintiff's initial case of age discrimination is established with each of four elements: 1) the worker is a member of a protected age class; 2) she experienced an adverse employment action; 3) she was qualified for the position held; and 4) she was replaced by a significantly younger worker.[228]

Sublett was fifty-seven when Marsh and Judy told her that she would be losing her Director position at Pillars.  She was fifty-eight when she was actually demoted, and still fifty-

---

[225]   Ex. 3, Truax Dep., pp. 171, 176.
[226]   KRS 344.040(1).
[227]   *See, e.g., Williams v. Wal-Mart Stores, Inc.* , 184 S.W.3d 492, 495 (Ky. 2005).
[228]   *See Hardin v. Jefferson Cty. Bd. of Educ.*, 558 S.W.3d 1, 9 (Ky. App. 2018).

eight when she was fired.  Under the KCRA, that satisfies the protected class "age forty and over."  As discussed in prior sections, being paid less, demoted, and terminated are all adverse actions.  As also discussed above, Sublett was eminently qualified for the Director and RSM positions, and this item has not been disputed by MHK.

Sublett was replaced at Pillars was Chris Just, who was born in July of 1970, and who would have been forty-seven years old in early 2018.  She was replaced at Miralea by Shannon Wolfe, who was born in October of 1982, and who was thus under forty years old when hired.  Sublett is more than ten years older than Just, and twenty-two years older than Wolfe.  Both are significantly younger workers, using the ten-year measurement articulated by the Sixth Circuit.[229]

Aside from being replaced by younger workers, Sublett was paid less than Chris Just, who had no prior MHK tenure.  In two jobs, she was paid far less than Truax, who was born in 1974 and is fourteen years younger.  This is another indication of age discrimination.

As Sublett has established a *prima facie* case of age discrimination, MHK can articulate a legitimate, non-discriminatory basis for underpaying, demoting, and then terminating her.  The analysis is the same as that set forth above, in Section I of this Argument, and will ultimately require jury resolution.  Because of the various protected classes implicated by MHK's conduct, this is a mixed-bad-motive case.  As federal courts have recognized, a single event can have multiple but-for causes that violate the law.[230]  It will be up to a jury to determine which actually prompted each adverse action.

---

[229] *See Grosjean v. First Energy Corp.*, 349 F.3d 332, 340 (6th Cir. 2003); *see also Williams v. Brown-Forman Corp.*, 2019 Ky. App. Unpub. LEXIS 166 (Ky. App. 2019) (analyzing KCRA age discrimination claim in light of *Grosjean* rubric).
[230] *See Briggs v. Temple Univ.*, 339 F. Supp. 3d 466, 502 (E.D. Penn. 2018) (citing *Malin v. Hospira, Inc.*, 762 F.3d 552, 562, n.3 (7th Cir. 2014)).

IV.    **SUBLETT'S RETALIATION CLAIM IS WELL SUPPORTED BY LAW AND FACTS**

Under federal and state law, retaliation claims consist of the following elements: 1) a worker engaged in a protected activity; 2) the employer knew of the protected activity; 3) the employer took an adverse employment action or subjected the worker to severe and pervasive harassment; and 4) there was a causal connection between the knowledge of the protected activity and the adverse employment action.[231]

Under the Americans with Disabilities Act, requesting an accommodation is protected activity, such that retaliation is prohibited.[232]  Under the Kentucky Civil Rights Act, retaliation for protected activity such as seeking an accommodation is also prohibited.[233]  This claim does not rely on the actual existence of a disability, but rather, whether the worker had a good faith belief that she was engaging in the protected activity of requesting accommodation.[234]

A.  **Sublett Engaged in Protected Activity**

MHK seeks summary judgment on the retaliation claim on the sole basis that there was no protected activity in its view, addressing the first prong of the retaliation inquiry.  However, requesting an accommodation for disability is protected activity under the state and federal law.  First, under federal law, "[a] request for accommodation of a disability qualifies as protected activity" such that retaliation is prohibited.[235]  The retaliation claim is distinct, such that it can

---

[231]   *See, e.g., Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000); *Wolfe v. Norfolk So. Ry. Co.*, 66 Fed. App'x 532, 535 (6th Cir. 2003); *Brooks v. Lexington-Fayette Urban Cty. Hous. Auth.*, 132 S.W.3d 790, 801-803 (Ky. 2004); *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000).
[232]   *See* 42 U.S.C. § 12203(a).
[233]   *See* KRS 344.280 (5).
[234]   *See Howard v. Pearl Interactive Network Inc.*, 2018 U.S. Dist. LEXIS 131283, *13 (E.D. Ky. 2018).
[235]   *King v. Custom Resins, Inc.*, 2019 U.S. Dist. LEXIS 84133, *13 (W.D. Ky. 2019) (citing *Baker v. Windsor Republic Doors*, 414 Fed. App'x 764, 777, n.8 (6th Cir. 2011)); *see also Burress v. City of Franklin*, 809 F. Supp. 2d 795, 815-16, 25 Am. Disabilities Cas. (BNA) 631 (M.D. Tenn. 2011).

34

survive even if the person is not ultimately adjudged to be disabled under the ADA disability standard.[236]  Under state law, requesting an accommodation is also protected activity.[237]

There is no particular formulation by which a person must request an accommodation. "Simply asking for continued employment can be a sufficient request for accommodation."[238] A request for lighter duty also suffices.[239]  As discussed at greater length in Section II of this Argument, Sublett satisfied the basic requirement of articulating a need for accommodation to MHK's agents.

Sublett has testified clearly and consistently that she requested accommodations from MHK, going as far back as spring of 2017, when she asked to be excused from the Great Day of Service.  She asked to be relieved of various duties assigned to her by Truax.  Whether these requests were reasonable requests for accommodation is ultimately a jury question, but at this stage, MHK does not attempt to foreclose these issues on the basis of reasonableness.  It could not attempt to do so, since its Chief Human Resources Officer has already admitted that there was no hardship invoked by any requests of the sort at issue in this case.  Given MHK's present contention that the duties were "voluntary"[240] in nature, the employer is not expected to argue to the jury that there was any reason to refuse such accommodations requests.

---

[236]  *See Baker*, 414 Fed. App'x 764, 777, n.8
[237]  *See Lexington-Fayette Urban Cty. Human Rights Comm'n v. Bradford Green, LLC*, 2019 Ky. App. Unpub. LEXIS 262, *7 (Ky. App. 2019).
[238]  *Burress*, 809 F. Supp. at 813 (citing *Burns v. Coca-Cola Enters., Inc.*, 222 F. 3d 247, 257 (6th Cir. 2000).
[239]  *See id.*
[240]   It is unclear whether MHK means that workers who provide these services do so in an unpaid, volunteer capacity, or whether the allusion to voluntariness is really a reference to at-will employment.  Under federal law promulgated by the Department of Labor, to be considered a "volunteer," a person must perform work for a public agency "without promise, expectation or receipt of compensation for services rendered[.]" 29 CFR 533.101(a). This legal definition was crafted in order to prevent employers from pressuring workers to forgo pay entitlements under the guise of humanitarian free will.  *See generally id.* at (b).  Critically, a person is not a volunteer when, for a private employer, she performs work consistent with her own job description.  *See generally id.*; *see also id.* at (d). Here, the RSM job principally demanded "excellent customer service" for the residents and their guests. Ex. 7, RSM Job Descriptions, MH-SUBLETT 000150.  The specific duties that "may be required and assigned" very naturally included serving in a Miralea restaurant when instructed by the Director of the facility.  *See id.*  If MHK means that the job duties were "voluntary" in the sense that a person can leave at-will employment at any time, then it is missing the point of anti-discrimination laws that protect employment for the disabled who request accommodation.

### B.   MHK Knew of Sublett's Protected Activity

Sublett's testimony that she asked accommodations of her supervisor is enough to create a dispute of material fact.  After all, under MHK's own policies, Sublett was directed to seek assistance from her supervisor or Human Resources.[241]  In addition to that evidence, though, Truax – who was Sublett's supervisor at the time – has admitted that Sublett told him that the serving duties were "too hard," "too much," and taking a "physical toll" on her.[242]  As noted in Section II of this Argument, that was a sufficient articulation of a need for accommodation.  A reasonable jury can conclude that MHK knew, through its supervisor agent, that Sublett requested an accommodation.

### C.  Sublett Suffered Adverse Actions

The adverse actions for retaliation include those discussed in Section I(A)(3) of this Argument, but they can also include the increased scrutiny reflected in the PIP and the refusal to fully investigate Sublett's defenses as required by company policy.  That is because under the retaliation framework, adverse actions have a lower bar, such that they just have to be harmful to the point that they would dissuade a reasonable worker from engaging in the protected activity.[243]  These lesser, but still significant adverse actions made Sublett feel at risk, which MHK admits made her fear for her job on July 25, 2018[244] – even though she should not have had to fear, having done nothing wrong.

### D.  A Reasonable Jury Can Find Causation

As set forth in Sections I(A)(4) and I (B), causation due to an illegal motive is evident through strong circumstantial evidence, and MHK's proffered bases for the adverse actions

---

[241]  *See* Ex. 11, MHK Disability Accommodation Policy, MH-SUBLETT 000053.
[242]  Ex. 3, Truax Dep., 171-72, 176.
[243]  *See Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 57, 126 S. Ct. 2405, 2408, 165 L. Ed. 2d 345, 353 (2006); *see also Walker v. Com.*, 503 S.W.3d 165, 177 (Ky. App. 2016).
[244]  Def.'s Mot. S.J., DN 50, p. 6.

36

simply do not hold up to scrutiny.  Thus, a reasonable jury can conclude that any of the illegal motives, or a combination of them, was the actual catalyst for Sublett's series of adverse actions in 2018.

## **CONCLUSION**

For the reasons set forth herein, Plaintiff Kimetta Sublett respectfully requests that the Court deny the instant Motion.  A proposed Order is tendered with this Response.

Respectfully submitted,

 */s/ Robyn Smith*
Robyn Smith
Law Office of Robyn Smith
4350 Brownsboro Road, Suite 110
Louisville, Kentucky 40207
firm@robynsmithlaw.com
502-893-4569
*Counsel for Plaintiff*

**<u>CERTIFICATE OF SERVICE</u>**

It is hereby certified that the foregoing Response was served via electronic service through ECF, on this 19th day of March, 2021, on the following:

C. Laurence Woods, III
Irina Strelkova
Frost Brown Todd, LLC
400 West Market Street
32nd Floor
Louisville, Kentucky 40202
(502) 589-5400
*Counsel for Defendant*

<u>*/s/ Robyn Smith*</u>
*Counsel for Plaintiff*